### O'QUIN v. CHARLES STORES.

#### Civ. No. 427G.

United States District Court
M. D. North Carolina,
Greensboro Division.

Aug. 12, 1949.

Norman A. Boren, Greensboro, N. C., for plaintiff.

Brooks, McLendon, Brim & Holderness, Greensboro, N. C., for defendant.

HAYES, District Judge.

This is a motion for a new trial under Rule 59 and for judgment in its favor notwithstanding the verdict under Rule 50 (b), Federal Rules of Civil Procedure, 28 U.S.C.A. After notice, a hearing on the motion was held, arguments were heard and written briefs were filed.

The plaintiff L. R. O'Quin sued the defendant for $15,000.00 actual damages and $15,000.00 punitive damages growing out of an alleged malicious prosecution. The

case was tried before a jury which found that the defendant procured the institution of a criminal prosecution against the plaintiff in the Municipal Court of Greensboro under a warrant charging him with the larceny and receiving a blouse, property of Charles Stores of the value of $3.00; want of probable cause, that it was malicious and upon which plaintiff was acquitted.

A brief statement of the facts will assist in arriving at the law applicable on this motion.

L. R. O'Quin was a veteran in the recent war and after its termination he remained in the employ of the Army at Fort Bregg where he kept records and handled the payroll in his branch of the service amounting to thousands of dollars. He held the position a long time and was receiving $250.00 per month and his personnel rating was excellent. Desiring to become an accredited Accountant and realizing the need of more education, he gave up this job and entered Kings Business College in Greensboro as a student under the G.I. bill where he could graduate in two years. He was a married man and lived with his wife and child some distance South of Greensboro. He travelled in his car to school and back, returning home for lunch. Mr. James, a neighbor who was then a clerk in Myers Department Store, rode with him every morning and back home to lunch and then back to Greensboro, but he seldom got released from his work to return home with O'Quin who got out of school at four. James often put articles in O'Quin's car to take home. The car was parked regularly in Edwards parking lot about two blocks from Charles Stores.

On September 14, 1948, when O'Quin arrived at his car after school closed that day, he casually observed a lady's blouse on the front seat of his car but thought nothing of it as he assumed that his neighbor James had put it there. When he arrived at home he parked his car on the side of a public road, leaving the blouse there assuming that James would pick it up when he came that night. However, when James came to O'Quin's that night to borrow a shovel, O'Quin asked James if he had gotten that blouse out of the car and James then told him he knew nothing of it. Thereafter O'Quin got the blouse, carried it to the house and he and his wife examined it, saw it was pink and size 40; that it had a tag on it with the name of Charles Stores and for exchange in five days. They discussed the matter and concluded that it was an advertising scheme of Charles Stores to draw customers into its store. Mrs. O'Quin worked on night shift at Carters Fabrics and slept during the day except on Saturday.

A neighbor Mrs. Campbell happened to be over at O'Quins the next morning, Wednesday September 15, 1948, and invited Mrs. O'Quin to go with her to town but she declined as it was her bedtime. She asked Mrs. Campbell if she would carry a blouse for her to Charles Stores and exchange it for any color except pink which she had never worn and for a size 36, to which Mrs. Campbell agreed.

Mrs. Campbell presented the blouse to Mrs. King, clerk in charge of the blouse department, and told her she brought the blouse for a neighbor to be exchanged. Mrs. King asked for the sales ticket and, being informed that she did not have it, called the general manager of the store, Mr. George Carp. Carp asked Mrs. Campbell where she got the blouse and she said Mrs. O'Quin asked her to bring it for exchange. The manager said Mrs. O'Quin would have to come in person to make the exchange and wrote out a receipt to Mrs. O'Quin for the blouse for exchange only and told her to give that to Mrs. O'Quin.

On the following Saturday, Mr. and Mrs. L. R. O'Quin went to the Charles Stores and talked with Mr. Carp, presenting the receipt for the blouse. Carp asked them about it, and said the store had been bothered a lot lately by shop lifters, that the blouse did not appear to have been sold by the store as the tag was still on it. Tags consisted of two parts, the lower part to be detached when the article was sold. The O'Quins stated that if it was stolen they wanted nothing to do with it. L. R. O'Quin then explained in detail how he found it on the front seat of his car, explained about the custom of James, and after finding it was not the property of James, concluded it

was just an advertising scheme for customers. Carp told them he believed them and felt sure they were innocent but since they had been so nice and intelligent and cooperative, he would give them a blouse anyway; that the police were working on some shop lifters and he thought the officers would have them rounded up by next Saturday and for them to keep the receipt and come back then to get the blouse. This was the last extended conversation between them and it is very significant that the Manager testified in this trial that on the day of arrest of L. R. O'Quin he told Officer Jarvis he did not believe they had a case against the O'Quins.

James testified to the facts as O'Quin in regard to the discovery of the blouse, the conversation that night. Also O'Quin went over to the country store operated by L. E. Coltrano where he explained to him about the blouse. Coltrano testified that O'Quin told him about finding the blouse in his car that evening when he came from school but when James came over there that night he said it was not his, and so he said he thought it was put in his car as an advertisement to draw him to trade at Charles Stores. James and Coltrano were men of good character and wholly disinterested. O'Quin proved an excellant character by them, and also by witnesses from the community where he lived until he entered the Army among whom were J. C. Bullock, a merchant and farmer, R. G. Johnson, a religious field worker and former teacher of O'Quin in the 9th and 10th grades, J. B. Collins, a farmer and builder, and P. A. Powell, a merchant.

On Saturday, Oct. 15, 1948, the O'Quins came to Greensboro. L. R. O'Quin kept a couple of puppies while Mrs. O'Quin went to purchase a coat for their daughter and went to Charles Stores to get the blouse. She asked Mr. Carp about the blouse and he told her to go to police headquarters and see Mr. Jarvis and tell him that he (Carp) sent her and he (Jarvis) would give her the blouse. After purchasing a child's coat she reported to her husband what Carp said, and they drove to City Hall and L. R. O'Quin told his wife to get the blouse while he circled the block and it was not convenient to park, besides he had the puppies in the car.

When Mrs. O'Quin arrived at Jarvis' office, no one was present except the clerk, Miss Cox. Mrs. O'Quin said she came to see the detective about the blouse; Miss Cox asked her what blouse and she said Mr. Carp, the Manager of Charles Stores, had referred her to Sergent Jarvis. Miss Cox then called Mr. Carp and told him there was a lady in the office and wanted to see about getting a blouse. Mr. Carp said he was familiar with that case and had talked to Sergent Jarvis and Money about it, and suspected the blouse was stolen. She said they would take care of it and Miss Cox then radioed Jarvis to come in. Detectives Jarvis and Money—in plain clothes—came and after talking to Mrs. O'Quin a few minutes, took her to the private detective room where they kept her a few minutes, perhaps twenty minutes in all. She insisted at all times the innocence of her and her husband, explained how her husband found the blouse in his car and their explanation to Mr. Carp and that Mr. Carp said he would give them a blouse— the detective asked her if she thought Charles would give her a blouse and she said he (Carp) said he would. The detective said he was going to arrest her anyway and she asked for her husband. The officers started downstairs to the warrant desk and met O'Quin coming after his wife. He wanted to know what she meant by staying so long and she said "these men have arrested me for stealing that blouse." He told the officers how he found it in his car and that his wife had nothing to do with it. Then the officers said they would release her and arrest him. They arrested him. One of them, Jarvis, called Carp over the 'phone and asked if he still had the blouse in the O'Quin case and he said he did, and Jarvis told Carp they were going to prosecute Mr. O'Quin and that Mr. Carp did not tell him he did not think we had a case against O'Quin. Money signed the affidavit for the warrant charging defendant with larceny and receiving the blouse, value $3.00 property of Charles Stores on which

warrant he was arrested and detained about 30 minutes until he could provide a bond of $100.00 for his appearance the following Tuesday.

The uncontradicted evidence shows that L. R. O'Quin became emotionally upset when the officers told him what they were doing; that he wept during the time of his detention, and while driving to his father's 75 miles away and that his father before getting to the house heard his crying and thought Mrs. L. R. O'Quin was dead, L. R. couldn't talk for 30 minutes.

At the trial Carp and Mrs. King were witnesses but neither would testify the blouse was stolen. Carp said it had been the property of Charles Stores and there was no record of its sale. Mrs. King said she, missed it a day or two before Mrs. Campbell brought it for exchange; that it disappeared while she was out at lunch. The girl who was in charge during lunch did not testify. O'Quin was acquitted and the Court told Carp he could take the blouse which he did and placed it on the counter at Charles Stores where it was sold.

Shop lifting in this store was a frequent occurrence and amounted to a considerable item.

The crucial question was whether Carp had any authority to do these things so as to make Charles Stores liable for his acts. Although he was General Manager, Clause 8 of his contract of employment restricted his powers as follows: "The Manager shall have no authority to use the name of the company to endorse any notes, checks, drafts, bills or other orders for the payment of money, guarantee or become surety for any person or persons whomsoever; nor to bind or to obligate the company for the payment of any moneys or otherwise, except only, to endorse checks for deposit only in the Company's bank account. The Manager shall likewise have no authority to purchase any merchandise, fixture, store supplies or anything else or incur any obligation of whatsoever nature for the Company without prior written authorization, in every instance, from the New York Office of the Company. The Manager shall likewise

have no authority whatever, expressly or by implication, on behalf of the company, to arrest or cause to be arrested any person whomsoever or to institute a civil or penal action or criminal prosecution of any kind, for any cause or reason whatsoever, whether in protection of the Company's, right, property or otherwise, or to suggest, aid, abet, commence, or assist in any such arrest, action or prosecution, without the prior written instructions of either the President, Vice-President, Secretary or Treasurer of the Company."

As Manager he was appointed and required to safeguard and sell the merchandise and to account therefor; to employ and discharge the help in the store. The nature of his several acts in connection with this blouse becomes very important under the law of North Carolina. The frequency of theft from the store, several times a week, the value being considerable and the steps he took to prevent it are questions of fact as to whether they were acts authorized or within the scope of his employment. Although he would not testify in this trial that the blouse was stolen and did not swear before the Municipal Judge that it was stolen, he reported to the police on the day Mrs. Campbell brought it in that it was stolen, thereafter he talked to Detectives Jarvis and Money and told them it was stolen and agreed to hold the blouse until they told him what to do with it; he told O'Quins that it was theirs and cautioned them to keep their receipt and he would give them a blouse as soon as the officers caught the shop lifters and they were hot on the trail then. Mrs. King, defendant's clerk in that department, heard Carp tell O'Quins that first Saturday he appreciated their bringing the blouse in, and he hoped it would help him stop some of the shop lifting that had been going on recently, and that he was not accusing them of anything, that he thought they looked like very intelligent people. But after they left, he reported to the detective that O'Quin and his wife came in and he told them to come back and he agreed with Officer Jarvis to call him when they returned. It does not appear that Carp ever

told the officers of O'Quin's explanation of how the blouse came into his possession. Instead of Carp calling Officer Jarvis on the day of arrest to come to the store as he had previously agreed, he sent Mrs. O'Quin to the police station. Carp not only told O'Quin to keep the receipt for the blouse and that he would give them one, but he was unwilling to exercise ownership over it for the store until the officers authorized him, and he did not get this authority until O'Quin was acquitted on the warrant. Then he assumed ownership for the Company and put it on sale.

At the close of all of the evidence the defendant moved for a directed verdict in its favor for that the evidence disclosed that Carp had no authority to institute or to aid or abet in the institution of a criminal prosecution. The motion was denied. Under the law of North Carolina a principal is liable for the acts of his agent which are authorized or which arise in the performance of the duties he is authorized to do and within the scope of his employment. Kelly v. Newark Shoe Store Co., 190 N.C. 406, 410, 130 S.E. 32.

There is ample evidence to show Carp was general manager in charge of defendant's Greensboro store. He attended to the management of all of its business there. The clerks were subject to his control. The accounting for sales and safety of merchandise were directly under his control and in the scope of his employment. As was said in the Kelly case above, 190 N.C., at page 409, 130 S.E. at page 34: "The term 'manager', applied to an officer or representative of a corporation, implies the idea that the management of the affairs of the company has been committed to him with respect to the property and business under his charge. Consequently his acts in and about the corporation's business, so committed to him, is within the scope of his authority." The defendant relies on Lamm v. Charles Stores Co., 201 N.C. 134, 159 S.E. 444, 446, 77 A.L.R. 923, where defendant escaped liability for the acts of its general manager in swearing out a warrant for giving a worthless check: At page 138

of 201 N.C., at page 446 of 159 S.E., the reason for the decision is tersely stated: "The whole controversy reduces itself to the inquiry, Was long acting in the line of his duty when he wrote the letter forty six days after the transaction, and procured the issuance of a warrant one hundred and nine days after the transaction." It is then held that the company was not liable because these acts are not incidental to the duties of the general manager. It is clear from the authorities in this state that an agent is without authority to prosecute a criminal action for a completed crime, a past event. The defendant here contends that the evidence in the instant case brings into play this principle of laws: The defendant ignores the plenary evidence in the record showing that even Carp wouldn't say the blouse was stolen nor that the O'Quins had committed any crime; it ignores his acts in thanking them for their corporation and requesting them to keep the receipt and come back for the blouse he would give them for cooperating with him in helping to catch shop lifters; that he told Mrs. O'Quin to go to Mr. Jarvis and he would give her the blouse. The evidence warrants the inference that he was afraid to assert ownership of the blouse lest he might not be able to prove it, nor that O'Quin had received it with knowledge it was stolen. It ignores the fact that Carp refused to exercise ownership of the blouse until the officers told him he could, nor did he feel that he was safe in withholding it without giving O'Quin one to take its place. Certainly it can not be denied that Carp had fully convinced O'Quins he was under obligation to give them a blouse at all events and advised her to go to Officer Jarvis to get it. It is a question of fact to be determined by the jury whether the acts of Carp were in the line of his duty and within the scope of his employment. Liability flows from the acts of the servant in attempting to do what he was employed to do—the acts complained of must have been done in the line of his duty, and within the scope of his employment. Kelly v. Newark Shoe Stores Co., supra.

Mrs. King was quick to realize that she had no authority to exchange the blouse and called the manager. Undoubtedly he was acting for the company in receiving it and executing a receipt to Mrs. O'Quin showing she had a blouse there for exchange only and in telling Mrs. Campbell to have Mrs. O'Quin to come in person to make the exchange; he was still acting for the company when Mr. and Mrs. O'Quin came to talk with him and to get the blouse. The jury would be amply warranted in finding that he was acting within the scope of his authority when he told them the store had suffered from shop lifters whose trail they were on, and to keep the receipt and return the following Saturday and he would give them a blouse anyhow, that they were entitled to it as it was found in their car. It is incredible that these duties are beyond the scope of a general manager's powers, and that the officers of defendant in New York would have to be consulted before the manager could receive a blouse for exchange and when and how he would give another for it.

The motion for a directed verdict on that phase of the case was denied and I am still of the same opinion.

It is insisted also that the evidence did not warrant a finding by the jury that the manager instigated or procured the criminal prosecution. The court followed the law of North Carolina in Kelly v. Durham Traction Co., 132 N.C. 368, 369, 43 S.E. 923, and same case on rehearing in 133 N.C. 418, 45 S.E. 826. On page 372 of 132 N.C., on page 925 of 43 S.E., the rule is stated: "It is not necessary to show who actually swore out the warrant, provided it was at the instigation or procurement of the defendant. * * * There was evidence tending to prove that defendant instigated the prosecution. It is true, it is merely circumstantial; but, if circumstantial evidence is competent on an issue of life a death, we see no reason why it is not equally competent in civil cases." Then on the rehearing at page 419 of 133 N.C., at page 826 of 45 S.E., the court said: "We there held that, while there was no evidence that the defendant swore out the warrant, there were evidential circumstances from which the jury might infer that the warrant was issued at the instigation of the defendant. It is not necessary that the defendant should, through one of its authorized agents, make the affidavit on which the warrant issued, or directly apply therefor. It is sufficient if it directly or indirectly procured it to be issued." The court adopts the views of Holden v. Merritt, 92 Iowa 707, 61 N.W. 390, 391, to the same effect as above, from which I quote: "It need not be shown that the defendant ordered or directed the warrant or process to issue, or that he participated in its execution. If he, on his own motion, gave information or made complaint to the officers of the law in such a manner as that, in the regular and ordinary course of events, an arrest must be made, or will probably follow, this is sufficient to warrant the jury in finding him the real prosecutor."

There was evidence tending to show Carp reported to the officers that the blouse in question was stolen and that he agreed to call the officers to the store if a claimant came for the blouse; that he agreed to hold the blouse and not to accuse anyone of stealing it and to let the City detective handle it. He admitted reporting to the police immediately after Mrs. Campbell brought the blouse to the store, and again immediately after Mr. and Mrs. O'Quin came and fully discussed the circumstances of its being found in O'Quin's car; but there is no evidence that he ever gave the detectives a disclosure of these mitigating circumstances. The evidence tends to show that at the time he told O'Quin and his wife to return, he notified Officer Jarvis and agreed to call him to the store if and when they did return. The jury could find from the evidence that he thereafter got afraid to let the officer arrest them in defendant's store and thereafter told Mrs. O'Quin a falsehood to get her into the hands of the police, knowing all this time that L. R. O'Quin was the one who found the blouse in the car, and that all this circuitous handling of the case was a part of his scheme to get O'Quin arrested; that immediately before the arrest, Officer Jarvis told him he was going to prosecute Mr. O'Quin at which time Carp

claimed to have told Jarvis he did not think he had a case against O'Quin which Jarvis denied; that Carp was fully aware of the procedure of the detectives in handling shop lifting cases as he had long experience with these officers in such matters. On this phase of the case the court instructed the jury to answer the first issue in favor of the defendant if they found from the evidence that Carp did nothing more than make a full and fair statement of the facts to the officers or if the jury found that immediately before the arrest of L. R. O'Quin, he (Carp) told Jarvis he did not think there was a case against Mr. O'Quin. The defendant had not pleaded good faith or the existence of facts justifying it in believing O'Quin guilty of a crime. The above instruction was perhaps more than the defendant was entitled to have but the court felt that after the investigation had proceeded up to the time O'Quin was in the police building, if before the arrest Carp told Jarvis he didn't believe there was a case against O'Quin that discharged Carp from his previous participation and in that event Carp would not be the procurer of the warrant. But the jury found he did not tell Jarvis that; it found that he did not make a full and fair disclosure of all of the facts to the officers and that he instigated or procured the criminal prosecution. There was abundant evidence to support the findings.

On this motion for a new trial, the defendant urges the point that the acts of Carp are not a part of the res gestae; that they were not committed to prevent the taking of the blouse, that the offense had been committed already, and what he did thereafter was to get a supposed thief, relying primarily on Hammond v. Eckerd's of Asheville, 220 N.C. 596, 18 S.E.2d 151. However, this case simply holds that a mere clerk in a cigar store has no implied authority to go out of the store and accuse someone of stealing cigars and causing him to be searched by an officer. If Mrs. King the mere clerk in defendant's store, had committed the acts instead of Carp, the general manager, the Hammond case would apply. Long v. Eagle 5, 10 and 25¢ Store Co., 214 N.C. 146, 198 S.E. 573, involves an assistant Manager and factually approximates the instant case. A judgment against the defendant was sustained. It is unnecessary here to state again the facts which show that this case was not a prosecution for a crime already committed, the fate of the blouse returned by O'Quin was at stake until the criminal trial terminated in favor of O'Quin; the manager thereafter and for the first time took unrestricted possession of it for his company, placed it on sale, and sold it. The evidence does not warrant a holding as a matter of law that the offense, if any, was completed long before the instigation of the prosecution as was the case in Lamm v. Charles Stores, supra.

There is no merit in the contention that O'Quin was arrested on the basis of his statement to the police; it is true that the officers agreed to release Mrs. O'Quin and arrest Mr. O'Quin because he found the blouse in his car, but the information was furnished the detectives by Carp before that. The only information the officer got came from Carp and Mr. and Mrs. O'Quin. The officers did precisely what Carp called them to do, they arrested O'Quin because he was found in possession of what Carp reported as a stolen blouse, although he does not testify in either court that it was stolen. He was not candid; there were conflicts in the statements by the detectives and Carp and the jury could well reject the shallowy pretext that Carp was merely acting in the interest of the public. The Ellis v. Farmers' Trust Bank & Co., 209 N.C. 247, 183 S.E. 368, is clearly inapplicable. The jury could find from the evidence that Carp knew by sending Mrs. O'Quin to the City detective, the officer would arrest L. R. O'Quin because Carp knew that L. R. O'Quin came into the possession of the blouse before Mrs. O'Quin and that in the natural course of events L. R. O'Quin would be prosecuted. The facts are wholly different from Ellis v. Trust Co., supra.

■ The court's instructions on probable cause were in accordance with the rule stated by the Supreme Court of North Carolina and does not conflict with Mooney v. Mull, 216 N.C. 410, 5 S.E.2d 122, 125 A.L.R. 893. The court instructed the jury specifically that the burden of proof was on plaintiff to show by the greater weight

of the evidence that the plaintiff had not stolen the blouse or received the same knowing it to be stolen. Failure to do this caused the new trial in Mooney v. Mull. Defendant on this motion contends that the existence of probable cause depends upon the facts within the knowledge of the public officers at the time of the arrest but I am unable to see any merit in this because the entire evidence shows that the officers had no information in addition to what Carp, the manager, had from his interview with Mr. and Mrs. O'Quin. The test, it seems, is (1) whether L. R. O'Quin was innocent of the criminal charge, as to which the burden of proof was on him to carry and (2) did the defendant through its manager not have knowledge of facts sufficient to lead a man of ordinary prudence to believe that the defendant in the criminal action was guilty of the crime as charged.

On the issue as to Malico, again the court stated the law of North Carolina on the subject. It is stated repeatedly in the cases cited above and in Downing v. Stone, 152 N.C. 525, 527-529, 68 S.E. 9, 136 Am. St.Rep. 841, 21 Ann.Cas. 753. The officers derived no new facts from any source not before made known to Carp and I am unable to see how defendant was harmed by applying the test to defendant's general manager instead of applying it to the police. Savage v. Davis, 131 N.C. 159, 42 S.E. 571, and Gaither v. Carpenter, 143 N.C. 240, 55 S.E. 625, do not sustain defendant's contention.

■ The objections to the court's charge on the issues as to damages, waiving the sufficiency of the objections, are without merit. It is surprising to this court that defendant contends there was no evidence as to loss of time, injury to reputation, health, mental suffering, etc. The defendant still treats the plaintiff rather callously in view of such a contention. It seems unable to recognize that the plaintiff is a man of any character and that its $3.00 blouse and private contract between it and Carp are the matters of importance. At the pre-trial examination it asked plaintiff if he had not been convicted of crime and elicited from him a statement that he was a member of a baseball team and forgot to get the equipment and in rushing back for it was cited for speeding which was exceedingly trivial; defendant asked Mrs. O'Quin if she had not been convicted of a crime and elicited from her that she pleaded guilty of violating the city ordinance when in fact her sister was actually running the radio too loud and at a late hour to which she tendered a plea rather than bring her sister into it. It seems not to realize that the plaintiff was a man of excellent character; that after serving during the war he held a good job at Fort Bragg, a position of honor and trust, which he surrendered to take a two year course in a business college to better fit him for better jobs; that he was doing well in his studies until this unfortunate blouse matter arose; that he and his wife frankly told him about him finding it in the car and what followed; that O'Quin and his wife appeared intelligent and cooperative and any ordinary prudent person after seeing them and talking with them would conclude, as Carp told them, that they were innocent; and when he and his wife were accused for the first time, so far as they know in the police station, of stealing the blouse he was crushed and wept convulsively and how it continued to affect him that way; of his telling his Daddy he wished he had been killed in battle instead of bringing disgrace by being accused of stealing a $3.00 blouse; of losing 21 pounds of weight due to worry over it; his inability to sleep without sleeping powders, corroborated by his wife and father and by Dr. Stevens who examined O'Quin for the defendant; his being forced to be excused from attending school due to his inability to concentrate; children saying, "There goes Leroy, they have arrested him for stealing," and other evidence too extensive to relate. The actual damages awarded him were in fact small in comparison with what the jury might have done.

I have given three days entirely to a review of this case and of the excellent brief filed by defendant's able counsel and knowing their ability I have examined the cases with unusual care. I see no valid reason to grant a new trial and therefore deny the motion.

The defendant excepts.