# Review of 1988 Opinion Concerning the Applicability of Section 504 of the Rehabilitation Act to Individuals Infected with HIV

The 1988 Office of Legal Counsel opinion accurately describes the duties imposed by section 504 of the Rehabilitation Act with respect to individuals infected with the Human Immunodeficiency Virus

The subsequent passage of the Americans with Disabilities Act did not alter the analysis of cases arising under the Rehabilitation Act, although an amendment to section 504 now requires reference to standards set forth in the ADA

Application of the standards set forth under section 504 in any particular case requires consideration of current scientific understanding of HIV infection. Advances in the scientific understanding of HIV infection since 1988 may undermine some of the discussion in the 1988 opinion about the application of these standards to individual cases

July 8, 1994

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL FOR ADMINISTRATION

You have asked us whether an Office of Legal Counsel Memorandum of September 27, 1988, 12 Op. O.L.C. 209 (1988), entitled "Application of Section 504 of the Rehabilitation Act to HIV-Infected Individuals," ("1988 O.L.C. Memorandum") accurately reflects the state of the law on this issue. That memorandum concluded that section 504 of the Rehabilitation Act, 29 U.S.C. § 794, bars discrimination against individuals infected with the Human Immunodeficiency Virus ("HIV"), whether or not the infection has resulted in illness. *Cf. School Bd. of Nassau County v. Arline*, 480 U.S. 273 (1987) (holding that section 504 bars discrimination on the basis of infection with tuberculosis, but reserving the question whether the Act applies to asymptomatic carriers of infectious diseases).

We have reviewed the 1988 O.L.C. Memorandum, and have concluded that it accurately describes the duties imposed by section 504 of the Rehabilitation Act with respect to individuals infected with HIV. We do, however, have a few comments to update the analysis of that Memorandum.

## A. *Impact of the Americans with Disabilities Act of 1990*

First of all, we note that section 504 of the Rehabilitation Act has been amended to indicate that

> [t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under

141

this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

29 U.S.C. § 794(d).[1]   Because the anti-discrimination in employment provisions of the Americans with Disabilities Act ("ADA") were in large part modeled on those established in the Rehabilitation Act, and because the legislative history of the ADA reaches the same conclusions as to the reach of the Rehabilitation Act as did the 1988 O.L.C. Memorandum and indicates an intent to codify those conclusions as the standards for evaluating cases brought under the ADA, this amendment to section 504 of the Rehabilitation Act for the most part reinforces rather than supplants our earlier analysis.[2]   Furthermore, the ADA specifically states that, "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 or the regulations issued by Federal agencies pursuant to such title." 42 U.S.C. § 12201 (citation omitted).[3]   As a general matter, therefore, the passage of the ADA requires reference to the standards set forth in that statute in litigation involving the Rehabilitation Act, but it does not alter the analysis of cases arising under the Rehabilitation Act, and indeed indicates that the interpretation of the Rehabilitation Act set forth in the 1988 O.L.C. Memorandum was correct.

Specifically, the text and legislative history of the ADA confirm that:

1. HIV infection, whether or not an individual has developed any overt symptoms as a result of that infection, is a disability under the Rehabilitation Act and under the Americans with Disabilities Act. *See* S. Rep. No. 101-116, at 22-24 (listing "infection with the Human Immunodeficiency Virus" as a disability; citing

---

[1] In addition, the term "disability" has been substituted for the term "handicap" in section 504(a) of the Rehabilitation Act, 29 U S.C § 794(a)

[2] *See, e g ,* H R Rep No 101-485, pt 2, at 52-57, 67-70, 76, 149 (1990), *reprinted in* 1990 U S.C C A N. 303, 334-39, 349-52, 358, 432, *id.* pt 3, at 29, 33-35, 40, 42, 45-46, *reprinted in* 1990 U S C C A.N 451, 455-57, 462, 464, 468-69, S Rep No 101-116, at 22, 25-26, 31, 36, 40 (1989) (all stating that the basic anti-discrimination provisions in title I of the ADA are modeled on those set forth in section 504, and in some instances explicitly endorsing the interpretations of section 504 set forth in *Arline*, 480 U S 273, and in the 1988 O.L C. Memorandum), *see also* H.R. Conf. Rep. No 101-596 (1990); Equal Employment Opportunity for Individuals With Disabilities, 56 Fed Reg 35,726 (1991) (Supplementary Information to regulations codified at 29 C F R pt 1630) ("The format of part 1630 reflects congressional intent, as expressed in the legislative history, that the regulations implementing the employment provisions of the ADA be modeled on the regulations implementing section 504 of the Rehabilitation Act of 1973 ")

[3] The legislative history notes, for example, that the provisions of the ADA setting forth requirements for the provision of access to public accommodations by providers who do not receive federal funding are less stringent than the corresponding provisions of the Rehabilitation Act addressing the provision of access to publicly funded accommodations *E.g .* H R Rep. No 101-485, pt 3, at 69-70, *reprinted in* 1990 U S C C A N. at 492-93  No such explicit differences exist with respect to the employment provisions of the two Acts.

the 1988 O.L.C. Memorandum for the proposition that those infected with HIV have "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual" within the meaning of both Acts; and describing disability definition generally); H.R. Rep. No. 101-485, pt. 2, at 51-54 (same), *reprinted in* 1990 U.S.C.C.A.N. at 333-36; *id.* pt. 3, at 28-30 (same), *reprinted in* 1990 U.S.C.C.A.N. at 450-52; *see also* 29 C.F.R. pt. 1630 app. at 403-05 (1993) (Interpretive Guidance to § 1630.2(j)) (stating that HIV infection is inherently "substantially limiting" within the meaning of both Acts). Indeed, the need to protect those infected with HIV from discrimination in employment was frequently cited by those supporting the bill. *See, e.g.,* S. Rep. No. 101-116, at 8, 19 (citing views of the President's Commission on the Human Immunodeficiency Virus Epidemic); 136 Cong. Rec. 10,872-73 (1990) (remarks of Rep. Weiss); *id.* at 10,912-13 (remarks of Reps. McCloskey and Waxman); *id.* at 17,292-93 (remarks of Rep. Waxman).[4] Furthermore, both the ADA and the Rehabilitation Act include within the definition of an individual with a disability an individual who, even though he or she has no actual physical or mental impairment or history of such impairment, is regarded as having an impairment. 42 U.S.C. § 12102(2)(C) (ADA); 29 U.S.C. § 706(8)(B) (Rehabilitation Act). This definition often will provide an additional basis for concluding that those infected with HIV are protected by section 504.

2. The definitions of "discrimination" and of "qualified individual" under the ADA are drawn from the definitions of these terms set forth in the section 504 regulations. *See* 42 U.S.C. §§ 12111(8) (definition of "qualified individual with a disability") and 12112 (definition of "discrimination"); H.R. Rep. No. 101-485, pt. 3, at 32-33 ("qualified individual"), *reprinted in* 1990 U.S.C.C.A.N. at 454-55; *id.* at 35 ("discrimination"), *reprinted in* 1990 U.S.C.C.A.N. at 457.

3. The legislative history indicates that the use of the term "direct threat" in the ADA is designed to "codify" the ruling of the *Arline* case discussed in the 1988 O.L.C. Memorandum.[5] The ADA indicates that an employer may raise as a de-

---

[4] In addition, recent cases construing the Rehabilitation Act have held that HIV infection is a disability within the meaning of the Act. *E.g., Buckingham v United States,* 998 F 2d 735 (9th Cir. 1993), *Chalk v United States Dist Court,* 840 F 2d 701 (9th Cir 1988), *Roe v District of Columbia,* 842 F Supp 563 (D.D C 1993), *vacated as moot,* 25 F.3d 1115 (D C Cir 1994); *Doe v District of Columbia,* 796 F Supp 559 (D.D C 1992); *Ray v. School Dist.,* 666 F Supp 1524 (M D Fla 1987); *Thomas v Atascadero Unified School Dist,* 662 F Supp 376 (C D Cal. 1987).

[5] In addressing the issue of the effect of the risk posed by an infectious disease on an individual's qualifications for a job, *Arline* indicated that "[a] person who poses a *significant* risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." 480 U S. at 287 n.16 (emphasis added) The Court stated that in making a judgment as to whether a person is qualified for a job, the employer should take into account

[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious); (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

143

fense to a claim of discrimination under the Act the argument that the employee was not otherwise qualified for the job because he or she posed a "direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). The statute defines "direct threat" as a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," 42 U.S.C. § 12111(3), apparently drawing on the "significant risk" language used by the *Arline* Court. 480 U.S. at 287 n.16. As noted above, the legislative history indicates that this language is intended to "codify" the standard set forth in *Arline*. H.R. Rep. No. 101-485, pt. 3, at 34, 45-46, *reprinted in* 1990 U.S.C.C.A.N. at 456, 468-69; *see also id.*, pt. 2, at 56-57, 150, *reprinted in* 1990 U.S.C.C.A.N. at 338-39, 433; H.R. Conf. Rep. No. 101-596, at 60, *reprinted in* 1990 U.S.C.C.A.N. at 568; S. Rep. No. 101-116, at 27-28, 40. In addition, the Equal Employment Opportunity Commission has issued regulations implementing the Act that use the test set forth in *Arline* for evaluating the risk posed by an employee with disabilities. 29 C.F.R. § 1630.2(r) (1993) (defining "direct threat" and requiring that employer consider "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm");[6] 29 C.F.R. pt. 1630 app. at 410-11 (Interpretive Guidance to 29 C.F.R. § 1630.2(r)) (employer must consider "objective, factual evidence," rather than "subjective perceptions, irrational fears, patronizing attitudes, or stereotypes," and must determine that there is a "high probability of substantial harm," rather than merely a "speculative or remote risk"). While the point is not free from doubt, the Interpretive Guidance also indicates that an employer may consider whether the individual would pose a direct threat to his or her own safety. *Id.*

4. The text and legislative history of the ADA indicate that the definition of reasonable accommodation is to include the possibility of reassignment, a question that was unsettled under the Rehabilitation Act before the recent amendment. 42 U.S.C. § 12111(9) (ADA definition of "reasonable accommodation"); S. Rep. No. 101-116, at 31-32 (indicating that "reasonable accommodation" under the ADA includes the possibility of reassignment); *see also* Barbara A. Lee, *Reasonable Accommodation Under the Americans with Disabilities Act: The Limitations of Rehabilitation Act Precedent,* 14 Berkeley J. Empl. & Lab. L. 201, 206, 235-43 (1993) (arguing that for this reason, case law interpreting the Rehabilitation Act that indicates that employers need not consider reassignment to meet their duties to

---

*Id* at 288 (quoting Brief for American Medical Association as Amicus Cunae 19, brackets in original). Furthermore, the Court stated that "[i]n making these findings, courts normally should defer to the reasonable medical judgments of public health officials." *Id*

[6] The regulation further provides that the determination whether an individual poses a direct threat shall be based on an individualized assessment of the individual s present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.
29 C.F.R § 1630.2(r).

provide reasonable accommodation should not be relied upon as precedent in suits brought under the ADA). Because neither statute purports to list all conceivable reasonable accommodations, *see* 42 U.S.C. § 12111(9) (ADA); 29 U.S.C. § 794 (Rehabilitation Act), and because the Rehabilitation Act indicates that the standards of the ADA are to be used to determine whether the Rehabilitation Act has been violated, 29 U.S.C. § 794(d), reassignment must be considered a possible reasonable accommodation under the Rehabilitation Act as well. *See also Buckingham v. United States*, 998 F.2d 735 (9th Cir. 1993) (Postal Service must consider, as a possible accommodation, relocating HIV-infected employee to area of country with better health care services for those infected with the virus).

5. The legislative history of the ADA clearly states that the term "undue hardship" for purposes of the ADA, and by implication section 504, *see* 29 U.S.C. § 794(d), is not to be construed as referring to the standard set forth in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) (construing Title VII as requiring an employer to accommodate religious beliefs only if it could be done with no more than a "de minimis" cost to the employer).[7] Rather, the ADA defines "undue hardship" as "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A). Among the factors to be considered in determining whether the difficulty or expense involved would be "significant" are the "overall financial resources" of the entity that must take the action. 42 U.S.C. § 12111(10)(B)(ii) and (iii).

### B. *Changes in Scientific Understanding*

Finally, we would note that advances in the scientific understanding of HIV infection since 1988 may undermine some of the discussion in our earlier opinion about the application of these standards to individual cases. *See, e.g.*, 12 Op. O.L.C. at 219-20, 229-30 (citing examples of situations in which it was thought that an individual infected with HIV might pose a direct threat to the health or safety of others).

Thus, for example, recent studies suggest that the risk of transmission from a health care worker to a patient is actually quite low. *See, e.g.*, Centers for Disease Control and Prevention, *Update: Investigations of Persons Treated by HIV-Infected Health Care Workers — United States*, 41 Morb. & Mort. Wkly. Rep. 329 (1993) (No. 17); National Commission on AIDS, *Preventing HIV Transmission in*

---

[7] *See* S. Rep No 101-116, at 36 (discussing *Hardison*); 29 U S.C § 794(d) (stating that standards of ADA apply in Rehabilitation Act cases), H R. Rep No 101-485, pt 2, at 87 (provision is derived from Rehabilitation Act and should be applied consistently with provisions construing that Act), *reprinted in* 1990 U S.C C A N. at 369; Lee, *supra*, at 206-07, Robert L Burgdorf, Jr., *The Americans with Disabilities Act· Analysis and Implications of a Second-Generation Civil Rights Statute*, 26 Harv C.R -C L L Rev. 413, 462-63 (1991)

*Health Care Settings* 7, 11-12, 15-18 (1992).[8]  The Centers for Disease Control have suggested guidelines for control of transmission of the virus that reflect this information.  Centers for Disease Control and Prevention, *Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures*, 40 Morb. & Mort. Wkly. Rep. 1 (1991) (No. RR-8); *see also* National Commission on AIDS, *supra* (discussing CDC Guidelines and other publications addressing techniques for preventing transmission of HIV in health care settings).[9]

We do not attempt to review the scientific data here, but we would emphasize that a determination under the ADA, and thus by implication under section 504, that an individual poses a "direct threat to the health or safety of other individuals in the workplace," 42 U.S.C. § 12113(b), which is to say "a *significant* risk to the health or safety of others that cannot be eliminated by reasonable accommodation," 42 U.S.C. § 12111(3) (emphasis added), must be made on an individualized basis, using the four-prong test set forth in *Arline*, 480 U.S. at 287-88, and adopted by the statute and regulations.  *See* 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r) (restating

---

[8] Indeed, the Centers for Disease Control have indicated that the only documented cases of transmission from a health care worker to a patient are those involving a Florida dentist who infected six of his patients through unknown means  41 Morb & Mort Wkly. Rep. at 331, *see also* National Commission on AIDS, *supra*, at 7  As of 1993, the Centers for Disease Control had reviewed the cases of 19,036 patients treated by 57 HIV-infected health care workers  41 Morb. & Mort Wkly. Rep at 329

[9] While courts typically have upheld restrictions on health care workers, *see, e g , Bradley v University of Tex M.D. Anderson Cancer Ctr*, 3 F.3d 922 (5th Cir. 1993), *cert denied*, 510 U S  1119 (1994), *Leckelt v Board of Comm'rs of Hosp. Dist No 1*, 909 F 2d 820 (5th Cir  1990); *Doe v  Washington Univ.*, 780 F Supp. 628 (E.D. Mo  1991), the reasoning of these cases often appears to be based on outdated medical information or weak scientific analysis that greatly overstates the risks posed by such workers and thus may not apply the statute appropriately  *Cf In re Westchester County Med. Ctr*, Department of Health & Human Services, Departmental Appeals Board, Docket No  91-504-2, Decision No. 191 (Apr  20, 1992) (restrictions on duties of HIV-positive pharmacist violated Rehabilitation Act; federal funding to hospital terminated).

We would emphasize that the standards set forth in 29 C F R. § 1630 2(r) for determining whether an individual poses a direct threat must be applied to health care workers as well as to workers in other fields  Accordingly, current medical information and consideration of the risks posed by the essential functions of the job must form the basis for a decision  In light of the current views of the Centers for Disease Control that the risks posed by HIV-infected health care workers are, in most health care settings, remote or nonexistent, we think that proper application of 29 C.F.R. § 1630 2(r) frequently will result in a finding that the worker does not pose a direct threat.

For more general discussion of the risks posed by HIV infection in other settings, *see Chalk v. United States Dist  Court*, 840 F 2d 701, 710 (9th Cir. 1988) (granting preliminary injunction reinstating HIV-infected junior high school, teacher to classroom duties, reasoning that Chalk had "strong probability of success on the merits" of his Rehabilitation Act claim because there was no evidence to support a risk of transmission), *Glover v  Eastern Nebraska Community Office of Retardation*, 686 F  Supp  243 (D Neb  1988) (mandatory hepatitis B Virus ("HBV") and HIV testing of employees of agency assisting mentally retarded clients not justified; there was insufficient evidence that infection would pose a danger to others), *aff'd*, 867 F 2d 461 (8th Cir ), *cert. denied*, 493 U S. 932 (1989).

For discussion of the risk in public safety professions, *see Roe v. District of Columbia*, 842 F. Supp  563 (D D.C  1993) (limitations on activities of firefighter infected with HBV unjustified, as firefighter would not pose direct threat when performing mouth-to-mouth resuscitation; in reaching this conclusion, the court noted that hospitals generally do not bar HBV-infected employees from performing CPR), *vacated as moot*, 25 F 3d 1115 (D.C  Cir 1994); *Doe v  District of Columbia*, 796 F  Supp  559 (D.D.C. 1992) (refusal to hire HIV-infected applicant violates Rehabilitation Act, as individual does not pose direct threat), *cf. Anonymous Fireman v. City of Willoughby*, 779 F  Supp  402 (N.D  Ohio 1991) (firefighter and paramedics may be tested for HIV in light of risk)

definition of "direct threat" set forth in *Arline*); H.R. Conf. Rep. No. 101-596, at 60 (Section 12111(3) is intended to codify the test set forth in *Arline*), *reprinted in* 1990 U.S.C.C.A.N. at 568; S. Rep. No. 101-116, at 27-28 (same). Furthermore, a determination that an individual poses a direct threat must be based on information about the essential functions of the particular job at stake and on current scientific information about the nature of the risks involved; speculative concerns, including unfounded and exaggerated fears of transmission risks, may not be relied upon to defend a conclusion that an individual poses a direct threat. *See, e.g.*, 29 C.F.R. pt. 1630 app. at 410-11 (Interpretive Guidance to 29 C.F.R. § 1630.2(r)).

Similarly, while the 1988 O.L.C. Memorandum, 12 Op. O.L.C. at 220, suggested that persons infected with HIV are subject to "dementia attack" and therefore may be unqualified for jobs in which a sudden loss of mental faculties could pose a safety risk, this discussion may be subject to misinterpretation. The discussion of hypothetical HIV-related problems in the 1988 O.L.C. Memorandum was not intended to be relied upon for litigation purposes, and the reference to dementia attacks was intended to refer only to the risk that an individual suffering from HIV-related dementia might occasionally be particularly severely affected. It is certainly true that an individual with symptoms of dementia, whether related to HIV or not, may not be "otherwise qualified" for certain jobs. However, neither the 1988 O.L.C. Memorandum nor any other source of which we are aware indicates that HIV-induced dementia occurs suddenly and thus would pose certain of the risks described in that memorandum. Furthermore, unpublished data compiled by the Centers for Disease Control and Prevention on June 30, 1993 indicated that less than 6% of adults known to the CDC to have AIDS were also known to have HIV-related encephalopathy, the most common cause of HIV-related neurological symptoms. *See* Centers for Disease Control and Prevention, *Adult Female AIDS Cases by Disease: CDC AIDS Data as of June 30, 1993* (indicating that 5.1077% were affected); and Centers for Disease Control and Prevention, *Adult Male AIDS Cases by Disease: CDC AIDS Data as of June 30, 1993* (indicating that 5.5688% were affected). Other sources indicate that neurological problems are most common in individuals with advanced HIV disease. *E.g.*, Richard W. Price, et. al., *The Brain in AIDS: Central Nervous System HIV-1 Infection and AIDS Dementia Complex*, 239 Science 586 (Feb. 5, 1988). Accordingly, we would caution readers that an argument that an individual is not otherwise qualified for a job because of the risk of dementia, like arguments based on the risk of transmission, must be grounded in scientific evidence that such a risk exists with respect to that individual, and is relevant to the determination whether the individual is otherwise qualified for the job.

DAWN E. JOHNSEN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
